GRADY S. HENSLEY v. D. L. MORETZ.

November 28, 1955.

Record No. 4433.

Present, Hudgins, C.J., and Spratley, Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*Stant & Roberts*, for the plaintiff in error.

*Jones, Woodward & Miles*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

D. L. Moretz brought this action to recover from Grady S. Hensley the sum of $500, alleged to be due as commission for his services in connection with the sale of a parcel of real estate owned by the defendant. After hearing the evidence and instructions of the trial court, the jury returned a verdict for Moretz in the amount

asked for, and from the judgment affirming that award we granted this writ of error.

Grady S. Hensley, sometimes herein referred to as defendant, assigns error to the refusal of the trial court: (1) to strike plaintiff's evidence; (2) to set aside the verdict as contrary to the law and the evidence and award him final judgment; and (3) to the granting and refusal of certain instructions.

Whatever agreement or understanding was had between the parties relative to the sale of defendant's land was oral. The material facts may be stated as follows:

According to Moretz, a real estate broker, the following negotiations took place between the parties. Having heard that the home of the defendant was for sale, he went to see Hensley and asked if that was true. Hensley replied, "Yes, it is for sale. I am asking $16,500 net." Moretz then said "Well, if some one contacts you, I will set as a price $17,300, which will give me an $800 commission," and the defendant agreed. A few days later, Herbert C. Hensley and his wife, residents of West Virginia, and strangers to Grady S. Hensley, called at Moretz's office to look at some real property. Moretz showed them the defendant's home and the Herbert Hensleys agreed to purchase the property for $17,300, including some blinds and drapes. Later some question arose as to the furnishings in the house, and Moretz, after talking with the defendant and the Herbert Hensleys, agreed to withdraw the drapes from sale and to cut his commission from $800 to $500. Two days later Herbert Hensley telephoned Moretz, and told him that he would take the property at a price of $17,000. Herbert Hensley said that he would like to have R. L. Shipley, a real estate and insurance agent, obtain for him an F. H. A. loan, in order to raise a portion of the purchase price. Thereafter, Moretz, Grady Hensley, Herbert Hensley and wife, and Shipley met in the latter's office. There a written contract of sale, prepared by Shipley, dated May 19, 1953, was executed by Grady S. Hensley, as vendor, and Herbert Hensley, as purchaser. Mrs. Herbert Hensley also signed the contract and the signatures were witnessed by Moretz. The contract contained the following pertinent recital:

"Witnesseth: that the vendor agrees to sell and convey and the purchaser agrees to purchase through the realtor, D. L. Moretz, that certain property * * *. The selling price of said property is to be $17,000, payable as follows: $2,000, receipt of which is hereby

acknowledged, as forfeit binder, the remainder to be paid from the proceeds from a loan, which has been applied for in the amount of $11,500. Upon closing of the loan, Grady Hensley will pay rent in the amount of the payments of the loan through the August payment. In the event the loan cannot be obtained in the amount of loan shown above, the full binder shall be returned without further obligation of the purchaser." * * *

The contract did not specify the time within which the sale was to be consummated, nor state how the difference between the purchase price of $17,000 and the down payment of $2,000 plus an F. H. A. loan of $11,500 was to be made.

Moretz said that at the meeting in Shipley's office, the purchaser asked him if he would take a note for his commission, and he refused. He recalled that the defendant said that he would have to have a "bigger binder than usual" and asked for a $2,000 down payment because he wanted to build another house, and the sum of $2,000 was paid to Grady S. Hensley at that time as a "forfeit binder." He further said that it was customary in transactions of the kind involved for the broker to hold the deposit; but that he made no objection to the payment to the defendant, in order to get his house started.

R. L. Shipley testified that he obtained from the F. H. A. a firm commitment to lend Herbert Hensley $11,900, good until November 7, 1953. He had no definite recollection about any discussion over the commission to be paid by the defendant.

On August 13, Herbert Hensley notified Moretz by telephone that he was not going to consummate the contract of May 19th. On August 24th, Moretz called the Herbert Hensleys over the telephone and asked them about complying with their contract, and they replied: "We are through, we have had financial reverses; there is nothing we can do. We just can't go through with the deal." In the conversation they suggested that they might file a petition in bankruptcy as a relief to their financial situation.

Moretz communicated the above information to Grady Hensley, and said to the latter that since he knew the deal was over, "Suppose we settle up. You have got the $2,000. Give me my commission and quit, and we will start all over from there." The defendant refused to pay him any commission, saying that Moretz's contract with him was to sell the property to yield $16,500 net to him, and he had not done so.

According to Grady Hensley, the circumstances were as follows:

Moretz came to a place where defendant was working, and asked him if he would sell his residence. Defendant replied: "Sure." Moretz then asked how much he would "have to have" and defendant said "Get me $16,500 and all over that you can have." The two then looked at the house. Shortly thereafter a relative of Mrs. Herbert Hensley came to look over the house, and asked defendant if it was for sale. He told her "Yes." She asked the price. Whereupon, he asked her if she had talked to Moretz about the property. She said she did not know Moretz. Grady Hensley gave her a price of $16,500; but refused to allow her to look over the house that night because it was too late. The next day Herbert Hensley and his wife inspected the house, and offered to buy it for $16,500. Defendant found out that they had "talked" to Moretz, so he called Moretz, told him of the occurrence, and asked him to see "what kind of a commission he could work out with the Hensleys, that otherwise the deal was off so far as he was concerned." Moretz later called defendant and told him he "had worked out a satisfactory settlement with the Hensleys and that they were going to take the house. The next thing we drew up this contract here * * *." At the meeting in Shipley's office, he said "it was understood that he (Moretz) would get his commission when the balance of the loan was received." Asked "Was there any conversation about a note relative to his commission," defendant replied: "The Hensleys, of course, when they found out I would take $16,500 and found out they couldn't get it at that, they claimed that they only had a certain amount of money to put in the house and they couldn't go over $16,500. I think Mr. Moretz told them he would take a note for his commission and that was agreed on. When they came down here to meet in Mr. Shipley's office to sign the sales contract, they agreed they would go ahead and pay him his commission when the loan was closed out."

On cross-examination with reference to the above conversation, defendant further said:

"No, it seems like Moretz—I don't remember the exact words of it, but it seems like Moretz told me that he would accept a note for his commission in order for them to buy the house. Of course, when we met in Mr. Shipley's office they said, 'No, we will just go ahead and pay his commission when the loan is closed out, that is the balance of the payment'."

After the Herbert Hensleys refused to comply with the sale, a demand was made by Moretz upon the defendant for $500. Grady Hensley denied that he owed Moretz anything, saying "I am still looking for the rest of my money." The defendant was always ready and willing to comply with the contract of sale.

Mrs. Ada Lee Hensley, wife of the defendant, who was present when her husband was first approached by Moretz, said this took place: "Well, Grady just told him he wanted $16,500 his part and all over that Mr. Moretz could have it. That is the only agreement that I remember." She did recall that the Herbert Hensleys and one of their relatives had visited her home, that she told them Moretz was handling the transaction; that Moretz told her he had priced the house to the Herbert Hensleys at $17,500; and that she refused to make any arrangements with the Herbert Hensleys and referred them to Moretz.

Moretz contends that since he procured a purchaser, who was accepted by the defendant, and a valid contract between the defendant and the purchaser was executed, he fully performed his agreement and was entitled to his commission. The trial court adopted that theory, and instructed the jury accordingly.

The defendant contended that his agreement with Moretz constituted a special contract under which Moretz should have as a commission any additional sum he might get from a purchaser in excess of $16,500 net to the defendant; that he did not agree to pay or become liable for any commission in the transaction; that $500 of the amount of the purchase price named in the written contract was to be the compensation of Moretz when the sale had been completed and the full purchase price paid; and that since the sale failed of consummation, through no fault of the defendant, and he did not receive $16,500 net, Moretz was not entitled to recover any sum from him. Notwithstanding defendant's evidence, the trial court refused to instruct the jury relative to his theory.

It must be borne in mind that there were two contracts in evidence, one an oral contract between Moretz and the defendant and the other a written contract between the defendant and Herbert Hensley. They relate, respectively, to different subjects, the first to the terms of employment of the broker, and the second to the terms of the sale of the property. The written contract does not alter the terms of the broker's contract in any particular. Moretz's name was inserted in the written contract obviously to show that

he was the procuring agent in effecting its execution. Each agreement stands alone.

When the evidence is carefully examined it gets down to the point as to the oral agreement between the parties relative to when there would be any obligation upon the defendant to pay the $500 demanded, or any other sum. Under that agreement, did Moretz earn his compensation when he brought the parties together in a binding contract of sale and included his fee in the amount named, or was he entitled to a $500 fee only when the purchaser paid the full price of $17,000, which included $16,500 net to the defendant? On this point there is some conflict in the evidence.

There is no other question presented in such a way as to here require our consideration and discussion.

The line of demarcation between the principles applying to the rights of a broker under a special contract and to his rights under a general agreement is clear and distinct. In the absence of a special contract, it is the general rule that a real estate broker is entitled to his commission when he has procured a purchaser ready, able and willing to purchase the property upon the terms fixed by the owner. The parties, however, may by special contract modify the general rule, and make the commission payable dependent upon certain conditions or contingencies, and when such stipulations are made, a fulfillment or performance of the prescribed conditions is generally essential to the right to compensation. The owner has a right to stipulate that he will not pay, or be obligated in any way to pay, for services in relation to the sale of his land, unless the prescribed conditions are fulfilled. 8 Am. Jur., Brokers, § 180, page 1096; 12 C. J. S., Brokers, § 83, pages 180, *et seq.*

We have been cited to no Virginia case, and we have found none, directly in point here; but the principles above stated have been expressed in a number of cases from this jurisdiction and elsewhere. *Crockett* v. *Grayson*, 98 Va. 354, 36 S. E. 477; *Murray* v. *Rickard*, 103 Va. 132, 48 S. E. 871; *Terry* v. *Bishop-Fry Co.*, 133 Va. 332, 112 S. E. 619; *Massie* v. *Firmstone*, 134 Va. 450, 114 S. E. 652; *Leicht-Benson Corp.* v. *Stone & Co.*, 138 Va. 511, 514, 121 S. E. 883, 43 A. L. R. 1100; *Snider* v. *New River Ins. Corp.* 187 Va. 548, 47 S. E. (2d) 398; *Duncan* v. *Barbour*, 188 Va. 53, 49 S. E. (2d) 260; *Campbell* v. *Sickels*, 197 Va. 298, 303, 89 S. E. (2d) 14; 8 Am. Jur., Brokers, § 179, page 1094, § 183, page 1097; 12 C. J. S., Brokers, § 84, pages 187, *et seq.*

In annotations relating to the right of a broker to commissions under a contract providing for payment of commissions out of the purchase price, in 20 A. L. R. 289; 51 A. L. R. 1390, and 73 A. L. R. 926, cases from other jurisdictions, denying in some instances, and sustaining in others, the right of a real estate broker to receive commissions under special circumstances, are reviewed and discussed. There is a wide conflict in the decisions due, in part, to the variety of circumstances under consideration, but a general agreement that the right of the broker depends primarily upon the terms of his employment.

The decisions are not in accord as to the broker's right to commission, under an agreement making such commission payable out of the purchase price, where the sale has not been consummated. In 8 Am. Jur., § 183, page 1097, citing authorities, this is said:

"Some of the courts hold that the broker is not entitled to commissions where either the purchaser or the owner defaults. Others, however, sustain the broker's right to commissions where the sale has failed because of the default of the owner, as well as where the sale has failed because of the default of the purchaser. The tendency, however, seems to be to hold the broker not entitled to commissions where the sale fails because of the purchaser's default and to sustain the right to commissions where it fails because of the owner's default."

In *Burnett* v. *Potts*, 236 Ill. 499, 86 N. E. 258, where the circumstances were somewhat similar to those involved here, the court held that in a contract whereby a real estate agent was to have as his commission all he obtained for land above a fixed price, the agent was entitled to no compensation until the principal received the price fixed upon, unless his failure to receive it was his own fault.

In *Hopkins* v. *Settles*, 46 Okla. 801, 149 P. 890, where the facts were almost identical to those here, the court held where the owner of a farm made a net price to a real estate broker, which he was willing to take for his land, and did not obligate himself in any way except for any sum the broker might obtain in excess of the net price, the broker was not entitled to receive compensation from the owner by merely finding a purchaser ready, willing and able to buy, and procuring from him a written agreement to take the land, where the purchaser fails to live up to his agreement, or to take and pay for the land.

The Massachusetts Court holds to the rule that where a real

estate broker is employed under a contract, whereby he is to receive as his commission the amount obtained over a stipulated sum, or whereby the property is to be sold at a set price to the owner, the broker is not entitled to recover against the owner, unless the sale be consummated, whether default in consummation be due to the owner or to the purchaser. *Shaw* v. *United Cape Cod Cranberry Co.*, (1954) — Mass. —, 127 N. E. (2d) 296; *Munroe* v. *Taylor*, 191 Mass. 483, 78 N. E. 106; *Staula* v. *Carrol*, 312 Mass. 693, 45 N. E. (2d) 822, 144 A. L. R. 919.

Cf. *Amies* v. *Wesnofske*, 255 N. Y. 156, 174 N. E. 436, 73 A. L. R. 918.

As will be noted from the evidence, there was not a wide difference between Moretz and the defendant as to the terms of the oral contract of brokerage; but there was enough to make the question of the terms of that contract the vital point in the case.

If the evidence of the defendant is true, this is not a case of the ordinary listing with a real estate agent upon commission, either agreed upon or implied, in which the broker would have earned his commission by finding a purchaser ready, willing and able to buy at the price the broker was authorized by the owner to sell for, and had consummated an enforceable contract of sale between the parties, which would have completed the broker's services and entitled him to compensation.

According to the defendant, Moretz was not entitled to receive any commission until he, the defendant, had received $16,500 net, and then only to such sum as the purchaser paid in excess of the said $16,500. In other words, Moretz was to be compensated, out of money paid by the purchaser, after defendant had received $16,500. This is not the case, however, if Moretz's theory is true, that the defendant waived his oral brokerage contract and agreed that Moretz should be compensated by obtaining a valid, enforceable contract of sale at an agreed price, upon terms prescribed by the vendor.

Because of the conflict in the evidence, we are of opinion that the question as to the nature and terms of the employment of Moretz by the defendant should have been submitted to the jury for determination. Moretz's right to compensation for his services depends upon those terms. In view of this conclusion, it follows that the instructions which were given to the jury were erroneous

in that they ignored pertinent evidence relating to the only real issue in the case.

The verdict of the jury is set aside, the judgment of the trial court is reversed, and the case remanded for a new trial in accordance with the principles herein stated.

*Reversed and remanded.*